# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JOHN A. BRASHEAR,** | ) | |
| 12145 Mountain Laurel Dr. | ) | Case No. |
| Roswell, Georgia 30075 | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## COMPLAINT

(Federal Tort Claims Act; Medical Malpractice)

### JURISDICTION AND VENUE

1.      This is an action under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671.

2.      This Court has jurisdiction under 28 U.S.C. § 1346(b)(1).

3.      Venue lies in this jurisdiction according to 28 U.S.C. § 1402, which provides FTCA claims "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred." The negligent act or omission occurred at Walter Reed Army Medical Center in Washington, DC.

### THE PARTIES

4.      Plaintiff, Major General (MajGen) John A. Brashear (ret.), is a resident of Georgia who resides at the address in the caption. At all relevant times pertinent to this Complaint, MajGen Brashear has resided at this address.

5.      Defendant United States of America is a Sovereign that has consented to be sued for negligent acts and/or omissions made by its employees, agents, and/or servants within the course and scope of their employment with the Defendant under the FTCA, 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671–80.

## STATUTE OF LIMITATIONS AND EXHAUSTION OF ADMINISTRATIVE CLAIM

6.      The medical malpractice incident giving rise to this FTCA claim against he United States government occurred between the dates of June 8, 2004 and October 25, 2004.

7.      Thereafter, MajGen Brashear timely filed his claim within the two-year statute of limitations applicable to such claims with the agency. *See* 28 U.S.C. § 2401(b).

8.      On December 8, 2010, the Air Force denied the claim, advising MajGen Brashear that he had six months to file a complaint under federal law.

9.      Having now exhausted MajGen Brashear's administrative remedy, this claim is timely and properly filed. *See* 28 U.S.C. §§ 2401(b), 2675.

## STATEMENT OF FACTS

10.      In March 2001, MajGen Brashear underwent a radical prostatectomy at a civilian hospital in Atlanta, Georgia. The operation resulted in an incontinence condition for which MajGen Brashear was given some follow on treatment at the Emory Clinic.

11.      On February 20, 2002 a cystoscopy was performed on MajGen Brashear which showed MajGen Brashear's urinary sphincter intact. The doctor performing the procedure noted "on asking patient to perform a Kegel maneuver, we would watch the sphincter tighten up nicely. . . . At rest, the patient was fully continent." The doctor's impression was, in part, "status post radical prostatectomy with mild stress incontinence,

which he is intolerant." Regarding the incontinence issue, the doctor indicated MajGen Brashear "can have a trial of collagen injections at the bladder neck, proximal to the sphincter" but noted that "I would be very reluctant to place an artificial sphincter for such a mild problem."

12.    On June 30, 2003, a cystometrogram performed by Dr. William Nabors at St. Joseph's Hospital in Atlanta, Georgia showed only mild incontinence.

13.    From August 15, 2003 through May 13, 2004, MajGen Brashear underwent evaluations primarily during visits for physicals with Captain Karen Smith at the Eisenhower Army Hospital in Augusta, Georgia. Although the meetings with Dr. Smith were not specifically to address treatment incontinence issues, MajGen Brashear did discuss incontinence treatment in May 2004 at which time Dr. Smith conducted cystoscopy.

14.    Because the limited amount of leakage MajGen Brashear was having at the time, Dr. Smith suggested MajGen Brashear consider having a collagen injection to possibly eliminate the problem. MajGen Brashear tentatively agreed to the collagen procedure but indicated that he would like to be further evaluated before making the decision. Accordingly, Dr. Smith scheduled an appointment for MajGen Brashear to see Colonel David McLeod, a urologist at Walter Reed Army Medical Center (WRAMC). Importantly, Dr. Smith made no note of any mucosal bridge.

15.    MajGen Brashear's appointment with Dr. McLeod was scheduled for 9:00 a.m. on June 8, 2004. However, when he arrived at Dr. McLeod's office, they were not expecting MajGen Brashear and had no medical information on him from Eisenhower. The information was subsequently faxed to Dr. McLeod's office and he was taken into

the procedure room at Walter Reed at approximately 3:30 p.m.

16.     When Dr. McLeod and MajGen Brashear entered the room where the procedure was to be conducted, there were six individuals present: two doctors who had just finished residency (Major Trent Sterenchock was one such individual); three technicians; and a visiting lieutenant from West Point Military Academy. As MajGen Brashear and Dr. McLeod entered the room, Dr. Sterenchock asked what procedure was taking place and Dr. McLeod indicated that it was a collagen injection for incontinence.

17.     During the procedure, MajGen Brashear was allowed to view the examination on a monitor. Dr. McLeod pointed out a small pinhole-sized hole in MajGen Brashear's urethral sphincter, which we indicated the collagen would close. Dr. McLeod began the injection by inserting a needle into the area.

18.     At the time, Dr. McLeod was using a needle clogged with collagen from a prior procedure, which made it difficult to inject the collagen.

19.     After a short time, Dr. McLeod commented on the amount or resistance he was getting in the injection instrument and stated something to the effect of "I must be hitting bone" while applying increasing pressure.

20.     Shortly after Dr. McLeod's statement, the screen picture was immediately covered by tissue and a shower of collagen caused by Dr. McLeod who, after applying rapid and excessive pressure, forced a large amount of collagen through the instrument and into MajGen Brashear's urethral sphincter.

21.     The room then became very quiet and Dr. McLeod stated that he needed another needle. Since there was no needle in the room, Dr. McLeod removed and departed with the needle to search for another. Dr. Sterenchock resumed the procedure

with a new needle and completed the procedure.

22.     When Dr. McLeod returned, he implied that everything was satisfactory and that MajGen Brashear would see immediate results.  He also stated that MajGen Brashear should not be concerned over any burning sensation or the passing of blood while urinating.

23.     By the time MajGen Brashear arrived at his lodging quarters, he was leaking very heavily.  By the next day, he was using five heavily soiled pads per day to collect his urine which was up from two moderately soiled pads per day prior to the procedure.  And he was now leaking while sitting which had not been the case prior to the procedure.

24.     Sometime after the procedure, MajGen Brashear contacted Dr. McLeod to express his concern about what he saw on the screen during the procedure.  Dr. McLeod stated that what MajGen Brashear had seen was of minor concern and that he should not worry about it.  Dr. McLeod then suggested MajGen Brasher return for a second collagen injection within a few weeks.  Shortly thereafter, MajGen Brashear learned that Dr. Sterenchock was being assigned to the Eisenhower Hospital in Augusta, Georgia. MajGen Brashear elected to have the second procedure done by Dr. Sterenchock.

25.     On August 27, 2004, MajGen Brashear reported to the Eisenhower Army Hospital and Dr. Sterenchock conducted a second injection.  As Dr. Sterenchock began the procedure, he noted something to the effect of "there is something that wasn't there before" and pointed out a second, much larger hole in MajGen Brashear's urethral sphincter.  Dr. Sterenchock then proceeded with the injection in an attempt to close the openings.  The procedure was conducted without complication.  However, the damage

from Dr. McLeod's previous injection was too severe and MajGen Brashear's incontinence continued causing leakage at the increased heavy rate.

26.     The following week, MajGen Brashear contacted Dr. Sterenchock and informed him that there had been no improvement in his condition.  Dr. Sterenchock informed MajGen Brashear that it now appeared that a third injection would not help. MajGen Brashear then contacted Dr. McLeod and informed him of the heavy leakage. He also told Dr. McCleod that Dr. Sterenchock noted a large hole in the urethral sphincter and that future injections would not help.  Dr. McLeod essentially replied that Dr. Sterenchock was wrong and that he would like to observe MajGen Brashear for himself. He further stated it might take three or four injections to correct the situation and that the next procedure would require heavy sedation. Being totally dissatisfied with the very heavy leakage he was suffering from at the time, MajGen Brashear agreed to being examined by Dr McLeod with the possibility of having a third injection if such an injection had a likelihood of success. Accordingly, MajGen Brashear was informed that Dr. McLeod had arranged an examination for October 21, 2004 at 9:00 a.m., a preoperational exam, if required, at 11:00 a.m. and a possible surgery on October 25, 2004.

27.     When MajGen Brashear arrived at Walter Reed on October 20, 2004, he was met by Dr. Boss, a first lieutenant in the Army Reserves, who immediately started to work on preoperative arrangements.  MajGen Brashear expressed surprise that he would be working on preoperative matters before there was an examination to determine if surgery was an option. Dr. Boss then discontinued his task and took MajGen Brashear to a patient waiting room.  Shortly after this a very upset Dr. McLeod came to the waiting

room and escorted MajGen Brashear to his office. When MajGen Brashear attempted to discuss Dr. Sterenchock's findings, Dr. McLeod stated "we are at an impasse." Nevertheless, an examination was set up and Dr. James Jezior was asked by Dr. McLeod to attend to verify the existence of a second hole in MajGen Brashear's urethral sphincter although Dr. Jezior would later claim that he was there to assist in "making the decision about additional collagen injections."

28.     Despite Dr. Jezior's intended purpose, Dr. McLeod conducted much of the cystoscopy in Dr. Jezior's absence.  He was not present during the entrance of the entry of the cystoscope and had was present only after the scope had passed the damaged area and entered the bladder. The monitor was set up but as McLeod began to insert the scope into the urethra the picture, clear at first, quickly became cloudy and did not clear until the scope had passed the damaged sphincter and had entered the bladder neck.  At this time—after the scope was passed the injured area—Dr. Jezior and Dr. Boss entered the room. This led to a discussion on the length of the urethra and the bladder neck, and the potential success of a third injection. At this point, Dr. Jezior commented that some patients require more injections than others and that he personally had a patient who was about to get a fourth injection. This led to MajGen Brashear agreeing to have another injection and the scope was withdrawn. Neither Dr. Jezior or MajGen Brashear got an opportunity to view the damaged sphincter.

29.     Having agreed to the third injection, MajGen Brashear clearly and firmly stated he did not want to be rendered unconscious during the procedure because he wanted to be able to observe.  Dr. McLeod agreed and stated he would use a spinal block for pain relief.  Once the spinal was administered, MajGen Brashear lay on a table and

was draped for the procedure. He was asked if he felt numbness, to which he answered in the affirmative. An object was then touch to his body to confirm the loss of feeling. MajGen Brashear then lowered his head and closed his eyes. Within a few minutes, MajGen Brashear received a sharp blow to his right testicle causing him to immediately lift his head and observe a startled Dr. McLeod standing in front of him. Very quickly, thereafter, the anesthetists forced his head back and held a mask to his face, rendering MajGen Brashear unconscious. According to anesthetists involved in the procedure, the backup to a spinal is almost always general anesthetic and they claim to have so counseled MajGen Brashear in this case. However, a description of this back-up plan anesthetic plan was not documented.

30.     Following the third injection, MajGen Brashear's incontinence persisted to the point of total incontinence. In 2006, MajGen Brashear sought an experimental placement of a ProAct artificial sphincter but the procedure was unsuccessful and the ProAct balloons had to be explanted.

31.     MajGen Brashear has no realistic prospects for restoration of sphincteric competence and relief from total urinary incontinence.

## COUNT: NEGLIGENCE

32.     The averments of the preceding paragraphs are incorporated by reference as if fully set forth herein.

33.     The Defendants including doctors, nurses, and other medical personnel owed MajGen Brashear the duty of care of professional health care providers with the degree and skill that comparatively reasonable, competent medical providers in the same or under similar circumstances would have provided.

34.     The Defendants breached this standard of care in the treatment MajGen Brashear received at Walter Reed Army Medical Center.   In particular, Defendants breached the standard of care by forcefully injecting collagen into MajGen Brashear's urinary sphincter.   A reasonable standard of care required Defendants to immediately desist from injection the collagen once substantial resistance to the injection was met.   By persisting and forcefully injecting a large amount of collagen, the Defendants breached the standard of care owed to MajGen Brashear.

35.     As a direct and proximate result of the negligence of Defendant United States, MajGen Brashear suffered irreversible damage to his urethral sphincter.

36.     MajGen Brashear is now almost totally incontinent and his realistic prospects for restoration of his sphincteric competence has been destroyed.   MajGen Brashear faces lifelong changes in his level of activity and enjoyment of life.

37.     Each of the medical personnel who attended to MajGen Brashear at WRAMC were employed by WRAMC and were acting within the scope of their employment at the time of their action.

WHEREFORE, the Plaintiff prays that the Court:

    A.  enter judgment against the Defendants in the amount of $2,000,000.00;

    B.  award Plaintiff attorney's fees and costs expended in pursuit of his claim;

    C.  grant any other relief that this Court deems just and proper.


Respectfully Submitted,


David P. Sheldon
Bar No. 446039
Law Offices of David P. Sheldon
512 8th St, SE
Washington, DC 20003
(202) 546-9575 (phone)
(202) 546- 0135 (fax)

*Attorney for Plaintiff*